raised by the facts, but not presented in the pleadings, should not come at the expense of due process." 273 Neb. at 1053, 736 N.W.2d at 373.

In the present case, the amended complaint filed by Matt sought to modify custody and to award full custody to him. Although Brittni and Cristian expressed a preference during the custody hearing for a schedule in which they would stay with their parents by alternating 1 week at a time, no complaint to modify the parenting plan to this or other effect was filed. See § 42-364(6). The district court correctly observed that the issue of modifying the parenting plan was not properly before it.

## CONCLUSION

The district court did not err when it denied Matt's amended complaint to modify custody, in which he sought full custody of the children. Furthermore, the district court did not err when it observed that the issue of modifying the parenting plan was not properly before it. Thus, we affirm.

AFFIRMED.

MILLER-LERMAN, J., participating on briefs.

———————

LOZIER CORPORATION, APPELLANT, v. DOUGLAS COUNTY
BOARD OF EQUALIZATION, APPELLEE.
___ N.W.2d ___

Filed April 19, 2013.    Nos. S-12-322 through S-12-324.

1.  **Taxation: Judgments: Appeal and Error.** An appellate court reviews decisions rendered by the Tax Equalization and Review Commission for errors appearing on the record.
2.  **Judgments: Appeal and Error.** When reviewing a judgment for errors appearing on the record, an appellate court's inquiry is whether the decision conforms to the law, is supported by competent evidence, and is not arbitrary, capricious, or unreasonable.
3.  **Taxation: Appeal and Error.** An appellate court reviews questions of law arising during appellate review of decisions by the Tax Equalization and Review Commission de novo on the record.
4.  **Taxation: Statutes.** The plain language of Neb. Rev. Stat. § 77-5013(2) (Cum. Supp. 2012) focuses on whether a mailing is properly placed in the mail, rather than on whether the Tax Equalization and Review Commission receives it.

5. **Statutes: Legislature: Intent.** The intent of the Legislature may be found through its omission of words from a statute as well as its inclusion of words in a statute.

6. **Statutes: Notice: Intent: Words and Phrases.** The intent of the "legible postmark" requirement in Neb. Rev. Stat. § 77-5013(2) (Cum. Supp. 2012) is to act as evidence of the date an appeal is mailed. A postage meter stamp, when viewed in the context of the pertinent U.S. Postal Service regulations, satisfies this purpose and is a "postmark" within the meaning of § 77-5013(2).

7. **Statutes: Jurisdiction.** An appellate court strictly construes jurisdictional statutes.

8. **Statutes: Jurisdiction: Legislature: Intent: Appeal and Error.** If the meaning of an ambiguous jurisdictional statute is unclear, even after reviewing the legislative history, the statute's purpose, and other resources, only then would an appellate court give it its most narrow interpretation.

Appeals from the Tax Equalization and Review Commission. Reversed.

James F. Cann, of Koley Jessen, P.C., L.L.O., for appellant.

Theresia M. Urich and Malina Dobson, Deputy Douglas County Attorneys, for appellee.

Heavican, C.J., Wright, Connolly, Stephan, McCormack, and Cassel, JJ.

Connolly, J.

## NATURE OF THE CASE

Lozier Corporation (Lozier) mailed three appeals to the Tax Equalization and Review Commission (TERC). Though Lozier mailed the appeals before the filing deadline, TERC did not receive the appeals until after the deadline had passed. A late-arriving appeal may still be timely if the mailing meets certain requirements under Neb. Rev. Stat. § 77-5013(2) (Cum. Supp. 2012). TERC determined that the mailing did not meet those requirements and dismissed the appeals as untimely. The primary issue is whether a postage meter stamp is a "postmark" under § 77-5013(2).

## BACKGROUND

Lozier claimed that the Douglas County Board of Equalization (the Board) had overvalued three parcels of land.

Lozier hired an accounting firm—Marks Nelson Vohland Campbell Radetic LLC (Marks Nelson)—to prepare and file three property tax appeals. The deadline to file the appeals was September 12, 2011.

The record shows that Marks Nelson prepared the appeals, placed them in a single envelope, marked the envelope with its postage meter, and then mailed the envelope by certified mail to TERC on September 1, 2011. But the envelope did not arrive at TERC. Instead, for unknown reasons, it arrived back at Marks Nelson on September 15. At that point, Marks Nelson marked its envelope with additional postage (using its postage meter) to send the envelope certified mail, return receipt requested. Making no other changes to the envelope, Marks Nelson again mailed it to TERC. TERC received the envelope on September 20.

TERC entered an order to show cause as to why it should not dismiss the appeals as untimely. A partner with Marks Nelson testified for Lozier to the above facts. He, along with a corporate officer at Lozier, argued that they had timely filed the appeals under § 77-5013(2). That section provides, in relevant part, that an appeal is timely filed "if placed in the United States mail, postage prepaid, with a legible postmark for delivery to [TERC] on or before the date specified by law for filing the appeal."

TERC first noted that the envelope did not have a U.S. Post Office "cancel[l]ation mark" but that it did have "two different Pitney Bowes postage labels" from Marks Nelson's postage meter. TERC noted that while there was "credible evidence that the envelope was placed in the United States Mail prior to September 15, 2011, . . . that envelope was delivered to . . . Marks Nelson . . . rather than to [TERC]." So TERC concluded that the envelope was in Marks Nelson's possession on September 15, 2011, and "not appropriately placed in the United States mail for delivery to [TERC] prior to that date." Finally, TERC concluded that the envelope arrived at TERC "without a legible postmark." TERC therefore determined that the appeals were untimely and dismissed them for lack of jurisdiction.

## ASSIGNMENT OF ERROR

Lozier assigns, consolidated and restated, that TERC erred in concluding that Lozier did not timely file its appeals under § 77-5013(2).

## STANDARD OF REVIEW

[1-3] We review TERC decisions for errors appearing on the record.[1] When reviewing a judgment for errors appearing on the record, our inquiry is whether the decision conforms to the law, is supported by competent evidence, and is not arbitrary, capricious, or unreasonable.[2] We review questions of law arising during appellate review of TERC decisions de novo on the record.[3]

## ANALYSIS

The issue is whether Lozier complied with the statutory requirements for a timely appeal under § 77-5013(2). Section 77-5013(2) states, in relevant part, that an appeal "is timely filed . . . if placed in the United States mail, postage prepaid, with a legible postmark for delivery to [TERC] on or before the date specified by law for filing the appeal." We previously addressed a version of this "mailbox rule" in *Creighton St. Joseph Hosp. v. Tax Eq. & Rev. Comm.*,[4] where we concluded that TERC lacked the authority to adopt the rule because it improperly expanded its jurisdiction. But the Legislature obviously has the authority to adopt such a rule, which it did in § 77-5013(2) after our decision in *Creighton St. Joseph Hosp.*[5]

At the outset, the Board argues that the September 1, 2011, mailing was irrelevant and that TERC properly focused

---

[1] See, e.g., *Republic Bank v. Lincoln Cty. Bd. of Equal.*, 283 Neb. 721, 811 N.W.2d 682 (2012).

[2] See *id.*

[3] See *id.*

[4] *Creighton St. Joseph Hosp. v. Tax Eq. & Rev. Comm.*, 260 Neb. 905, 620 N.W.2d 90 (2000).

[5] See, § 77-5013(2); 2001 Neb. Laws, L.B. 170, and 2004 Neb. Laws, L.B. 973.

on the September 15 mailing. The Board argues that this is so "because it is from this re-deposit into the U.S. mail on September 15 . . . that the envelope was eventually delivered to [TERC]."[6] In other words, because the September 15 mailing arrived at TERC and the September 1 mailing did not, the Board claims that the September 15 mailing must be the focus of our analysis.

We give statutory language its plain and ordinary meaning,[7] and we will not read into a statute a meaning that is not there.[8] Section 77-5013(2) does not provide that the mailing which arrived controls over a prior mailing which did not. Instead, § 77-5013(2) focuses only on whether the appeal was properly *placed in the mail* with sufficient postage and a legible postmark for delivery to TERC before the filing deadline. So whether the mailing actually arrived the first time has no bearing on whether TERC acquired jurisdiction. And this makes sense. If the Board's position was correct, then any time a person's appeal was returned after the last filing date, even if the person had done everything correctly and according to § 77-5013(2), the appeal would be untimely. This would be an absurd result because it would penalize taxpayers for events not under their control.

The U.S. Tax Court rejected an argument similar to the Board's in *Estate of Marguerite M. Cranor*.[9] In that case, the petitioner mailed his petition on September 3, 1999, well before the September 7 deadline. The September 3 mailing was correct in all respects, but it was returned to the petitioner on September 16. The petitioner removed the petition from the returned envelope and remailed it in a new envelope that same day. The Commissioner of Internal Revenue contended that the second mailing was the only one that mattered, that it occurred after the September 7 deadline, and that

---

[6] Brief for appellee at 10.

[7] See, e.g., *Spady v. Spady*, 284 Neb. 885, 824 N.W.2d 366 (2012).

[8] See, e.g., *Blakely v. Lancaster County*, 284 Neb. 659, 825 N.W.2d 149 (2012).

[9] *Estate of Marguerite M. Cranor*, 81 T.C.M. (CCH) 1111 (2001).

therefore, the court lacked jurisdiction to reach the merits of the petition.[10]

The court rejected the Commissioner of Internal Revenue's argument:

> [S]ection 7502(a) does not require that the qualifying envelope (i.e., the envelope which was timely mailed, properly addressed, and bore the proper postage) be the envelope in which the petition is received; nor does section 7502(a) bar application of the "timely mailing is timely filing" rule if a petition contained in a properly addressed envelope (that otherwise meets the above requirements) is returned to, and remailed by, the taxpayer.[11]

[4] The same reasoning applies here. We reject the Board's argument that the September 1, 2011, mailing is irrelevant to our inquiry. The plain language of § 77-5013(2) focuses on whether the mailing was properly placed in the mail, rather than on whether TERC received it. And because the September 15 mailing obviously occurred after the filing deadline, only the September 1 mailing could have conferred jurisdiction on TERC. It must be the focus of our analysis.

There is no dispute that Lozier placed the envelope "in the United States mail" on September 1, 2011, or that the September 1 mailing was before the September 12 filing deadline. Nor is there any dispute that the envelope had the proper postage. The only issues are whether Lozier placed the envelope in the mail "for delivery to [TERC]" and whether the mailing had "a legible postmark."

TERC seemingly concluded, and the Board now argues, that Lozier had not placed the envelope in the mail "for delivery to [TERC]" because it arrived at Marks Nelson's offices rather than at TERC. But errors are known to occur in the postal system, and the fact that Lozier's September 1, 2011, mailing did not arrive at TERC is not dispositive. And when viewed with the rest of the evidence, we conclude that both TERC's conclusion and the Board's argument are unreasonable.

---

[10] See *id.*

[11] *Id.* at 1113.

There is no dispute that Lozier intended to appeal several tax valuations and that it could only do so by sending the appropriate documents to TERC. It stands to reason, then, that Lozier intended to mail the documents to TERC so its appeals could be heard. Testimony supports this conclusion. A corporate officer at Lozier testified that Marks Nelson, on behalf of Lozier, mailed the appeals to TERC for review. A partner with Marks Nelson also testified that Marks Nelson mailed Lozier's appeals to TERC for review. Additionally, the parties do not dispute that the envelope contained an accurate address for TERC. And when Marks Nelson remailed the envelope on September 15, 2011, with no changes from the September 1 mailing other than adding postage for a return receipt, it did in fact arrive at TERC. We conclude that Lozier placed the envelope in the mail "for delivery to [TERC]" on September 1 and that both TERC's conclusion and the Board's argument otherwise are unreasonable.

Still, the Board also argues that the mailing did not comply with U.S. Postal Service (USPS) regulations and so for that reason, Lozier did not place the envelope in the mail "for delivery to [TERC]." Specifically, the Board argues that the return address was not located in the top left corner of the envelope and that the Marks Nelson logo was below the delivery line of the delivery address. We find these arguments unpersuasive.

We may take judicial notice of federal agencies' regulations.[12] The USPS' Domestic Mail Manual (DMM)[13] has been incorporated by reference into the Code of Federal Regulations and has the force of law.[14] It lists the types of mail which require a return address.[15] The record shows that Marks Nelson mailed Lozier's appeals on September 1, 2011, by certified mail, without a return receipt requested. The USPS apparently

---

[12] See *Gase v. Gase*, 266 Neb. 975, 671 N.W.2d 223 (2003).

[13] Mailing Standards of the United States Postal Service, Domestic Mail Manual, http://about.usps.com/manuals/welcome.htm (last visited Apr. 11, 2013).

[14] See 39 C.F.R. §§ 111.1 through 111.4 (2012).

[15] See DMM, *supra* note 13, § 602.1.5.3.

does not require a return address for such a mailing.[16] And although the USPS apparently recommends not placing a logo or label below the delivery line of the delivery address,[17] we see no requirement to that effect in the DMM. So to the extent that the USPS' regulations are relevant to whether Lozier placed its appeals in the mail "for delivery to [TERC]," in this case, they do not change our conclusion.

For an appeal to be timely filed, it must contain a legible "postmark" dated before the filing deadline. The record shows that the September 1, 2011, mailing had a Pitney Bowes postage meter stamp in the top right-hand corner of the envelope for $4.13. TERC impliedly determined, and the Board argues, that such a marking does not qualify as a "postmark." Lozier, on the other hand, argues that such a marking does qualify as a "postmark." This is an issue of first impression in Nebraska.

The meaning of a statute is a question of law,[18] which we review de novo on the record.[19] The Tax Equalization and Review Commission Act[20] does not define "postmark"; in fact, it is not defined anywhere in the Nebraska statutes. Nor is it defined in our case law. TERC has, however, defined "postmark" in the Nebraska Administrative Code. There, TERC has defined "Postmark" as "[t]he cancellation mark of the [USPS]. The mark of any private delivery or courier service (such as FedEx, Airborne, UPS, etc.) is not a postmark."[21] The Board invites us to apply that definition here.

But that definition explicitly applies only when "used in the Rules and Regulations of [TERC]," and even then it does not apply if "the context of a term's use requires a different definition."[22] Nor does it purport to define the statutory

---

[16] See *id.*

[17] See United States Postal Service, Business Mail 101, http://pe.usps.com/businessmail101/addressing/returnAddress.htm (last visited Apr. 11, 2013).

[18] See, e.g., *In re Estate of Fries*, 279 Neb. 887, 782 N.W.2d 596 (2010).

[19] See, e.g., *Republic Bank, supra* note 1.

[20] See Neb. Rev. Stat. § 77-5001 et seq. (Reissue 2009 & Cum. Supp. 2012).

[21] 442 Neb. Admin. Code, ch. 2, § 001.41 (2011).

[22] *Id.*, § 001.

term "postmark" as used in § 77-5013(2), but only the term "postmark" as used in TERC's rules and regulations. And although specifically defined, TERC's rules and regulations never actually use the term "postmark." We reject the Board's invitation.

Again, we give statutory language its plain and ordinary meaning.[23] "The plain meaning of the term connotes a mark placed on a mailed item."[24] Definitions for the term abound. For example, the USPS defines a "postmark" as follows:

> A postal imprint made on letters, flats, and parcels that shows the name of the Post Office that accepts custody of the mail, along with the two-letter state abbreviation and ZIP Code of the Post Office, and for some types of mail the date of mailing, and the time abbreviation a.m. or p.m. The postmark is generally applied, either by machine or hand, with cancellation or killer bars to indicate that the postage cannot be reused.[25]

Black's Law Dictionary defines a "postmark" as "[a]n official mark put by the post office on an item of mail to cancel the stamp and to indicate the place and date of sending or receipt."[26] And Webster's defines a "postmark" as "an official postal marking on a piece of mail; *specif*: a mark showing the name of the post office and the date and sometimes the hour of mailing and often serving as the actual and only cancellation."[27] The first two definitions indicate that only the USPS may make a "postmark," while the last definition could arguably include a postage meter stamp because the USPS authorizes and regulates postage meters' use[28];

---

[23] See, e.g., *Spady, supra* note 7.

[24] See *Chevron U.S.A. v. Department of Revenue*, 154 P.3d 331, 334 (Wyo. 2007).

[25] United States Postal Service, Glossary of Postal Terms, http://about.usps.com/publications/pub32 (last visited Apr. 11, 2013).

[26] Black's Law Dictionary 1286 (9th ed. 2009).

[27] Webster's Third New International Dictionary of the English Language, Unabridged 1772-73 (1993).

[28] See DMM, *supra* note 13, § 604.

so a postage meter stamp could be considered an "official postal marking."[29]

A statute is ambiguous if it is susceptible of more than one reasonable interpretation.[30] Based on the foregoing, we conclude that the meaning of the term "postmark" is ambiguous. It could mean only a mark made by the USPS or it could also mean marks made by postage meters, which the USPS licenses and regulates. We construe an ambiguous statute to give effect to its legislative purpose.[31] Our review of the legislative history of § 77-5013 provided no guidance as to whether the term "postmark" was intended to include postage meter stamps.

There are apparently various kinds of postmarks. For example, the USPS recognizes and defines "[e]lectronic," "local," and "philatelic" postmarks.[32] The Internal Revenue Service, in interpreting its own "'timely mailing is timely filing'" rule, recognizes both USPS postmarks and non-USPS postmarks.[33] Here, the Nebraska Legislature used only the unqualified, general term "postmark." This is noteworthy because the Legislature has in other sections qualified the term "postmark." For example, in Neb. Rev. Stat. § 77-27,125 (Reissue 2009), the Legislature used the term "United States postmark." In Neb. Rev. Stat. § 86-644 (Reissue 2008), the Legislature used the term "electronic postmark."

[5] Lozier accurately notes that the intent of the Legislature may be found through its omission of words from a statute as well as its inclusion of words in a statute.[34] The Legislature knew and understood that there were various types

---

[29] See *Severs v. Abrahamson*, 255 Iowa 979, 124 N.W.2d 150 (1963).

[30] See, e.g., *In re Interest of Erick M.*, 284 Neb. 340, 820 N.W.2d 639 (2012).

[31] See, e.g., *Blakely, supra* note 8.

[32] See Glossary of Postal Terms, *supra* note 25.

[33] *Estate of Marguerite M. Cranor, supra* note 9, 81 T.C.M. at 1113. See 26 C.F.R. § 301.7502-1 (2012). See, also, e.g., *Kahle v. Commissioner*, 88 T.C. 1063 (1987).

[34] See, e.g., *In re Interest of Joshua M. et al.*, 256 Neb. 596, 591 N.W.2d 557 (1999).

of postmarks, but it chose to use the general, unqualified term "postmark." Moreover, the Legislature was also presumably aware of the prevalence of postage meter use. "Federal legislation authorizing private postage meters has been in effect since 1920 and, as long ago as 1961, forty-five percent of all mail in this country and half of the business mail was processed by private meters."[35] If the Legislature meant the term "postmark" to mean only a USPS postmark, it could have said so explicitly, as it has elsewhere. It did not.

[6] We construe statutes to give effect to the underlying purpose of the statute.[36] Looking at the statute's language, the intent of the "legible postmark" requirement was to act as evidence of the date the appeal was mailed.[37] We conclude that a postage meter stamp, when viewed in the context of the pertinent USPS regulations, satisfies this purpose and is a "postmark" within the meaning of § 77-5013(2).

The USPS licenses and regulates the use of postage meters, as outlined in the DMM. Only authorized entities, such as Pitney Bowes, are able to provide postage meters, and no one but the USPS may actually own a postage meter.[38] The use of postage meters is heavily regulated. Mailers are required to place metered mail in the mail by the labeled date or correct the date using a date correction indicium.[39] Failure to do so will subject the mailer to penalties, such as loss of the postage meter.[40] Additionally, a person who misuses a postage meter runs the risk of being criminally prosecuted.[41] We believe these regulations are sufficient to qualify a postage meter stamp as satisfactory evidence of the date of mailing.

[35] *Chevron U.S.A., supra* note 24, 154 P.3d at 338. See, also, *Severs, supra* note 29; Charles Pomeroy Collins, *The Validity of Postmarks*, 47 A.B.A. J. 371 (1961).

[36] See, e.g., *Blakely, supra* note 8.

[37] See § 77-5013(2).

[38] DMM, *supra* note 13, §§ 604.4.1.3 and 604.4.2.

[39] *Id.*, §§ 604.4.5.1 and 604.4.6.2.

[40] *Id.*, § 604.4.2.4.

[41] See, *Severs, supra* note 29; 18 U.S.C. § 1001 (2006).

Other courts have reached similar results, reasoning that a postage meter stamp is a "postmark" because heavy USPS regulation of postage meters safeguards its evidentiary value as to the date of mailing.[42] We recognize that many of those courts operated under an older version of the DMM with different regulations. Most notably, the older versions of the DMM apparently included regulations indicating that the post office would inspect metered mail to ensure the postage meter stamp's date accuracy.[43] We have not found an equivalent regulation in the current DMM; rather, the onus appears to be on the mailer to correct any mistakes in the date of the postage meter stamp.[44]

But the absence of regulations explicitly saying that the USPS performs random checks of metered mail does not mean that a postal service worker would not correct, or bring to the mailer's attention, an incorrect date. The current regulations clearly require mail to be dated accurately.[45] Furthermore, in the absence of a contrary indication, lawful conduct—that mailers comply with the regulations—is presumed.[46] Moreover, though those regulations are missing, it remains true that the USPS authorizes and heavily regulates postage meter use and that misuse of a postage meter can result in significant penalties. Under such circumstances, and in the absence of evidence showing that the mailer misused the meter, we conclude that a postage meter stamp satisfies the statute's purpose of being evidence of the mailing date and that it is a "postmark."

[42] See, *Chevron U.S.A., supra* note 24; *Abrams v. Ohio Pacific Exp.*, 819 S.W.2d 338 (Mo. 1991); *Haynes v. Hechler*, 182 W. Va. 806, 392 S.E.2d 697 (1990); *Bowman v. Ohio Bur. of Emp. Serv.*, 30 Ohio St. 3d 87, 507 N.E.2d 342 (1987); *Severs, supra* note 29; *Frandrup v. Pine Bend Warehouse*, 531 N.W.2d 886 (Minn. App. 1995); *Gutierrez v. Industrial Claim App. Off.*, 841 P.2d 407 (Colo. App. 1992).

[43] See, e.g., *Bowman, supra* note 42.

[44] See DMM, *supra* note 13, § 604.4.6.2.

[45] See *id.*, §§ 604.4.5.1 and 604.4.6.1.

[46] See, *Coad v. Coad*, 87 Neb. 290, 127 N.W. 455 (1910); *Severs, supra* note 29.

We recognize, too, that other courts have held differently.[47] And although we agree that it is impossible for the USPS to "closely scrutinize all of the millions of meter-marked dates on the mail it processes,"[48] we believe the risk of an inspection to the mailer (and its attendant penalties) sufficiently discourages any mismarking.

[7,8] Finally, it is true, as the Board notes, that we strictly construe jurisdictional statutes.[49] But that does not mean that whenever there is a question about the meaning of a term, we automatically interpret it so as to foreclose jurisdiction. If that were the case, then there would be no "construction" at all. Instead, that principle serves to decide cases where, after further investigation, there is no ready answer. In other words, if the meaning of an ambiguous jurisdictional statute is unclear, even after reviewing the legislative history, the statute's underlying purpose, and other resources, only then would we give it its most narrow interpretation. That is not the case here. We conclude that a postage meter stamp is a "postmark" within the meaning of § 77-5013(2).

## CONCLUSION

Lozier's mailing met the jurisdictional requirements under § 77-5013(2). We reverse TERC's dismissal of Lozier's appeals as untimely.

Reversed.

Miller-Lerman, J., not participating.

---

[47] See, *Smith v. Idaho Dept. of Labor*, 148 Idaho 72, 218 P.3d 1133 (2009); *Lin v. Unemployment Comp. Bd. of Review*, 558 Pa. 94, 735 A.2d 697 (1999); *Machado v. Florida Unemployment Appeals*, 48 So. 3d 1004 (Fla. App. 2010); *Corona v. Boeing Co*., 111 Wash. App. 1, 46 P.3d 253 (2002).

[48] See *Smith, supra* note 47, 148 Idaho at 75, 218 P.3d at 1136.

[49] See, e.g., *Nebraska Dept. of Health & Human Servs. v. Struss*, 261 Neb. 435, 623 N.W.2d 308 (2001).